UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA
        Plaintiff,

v.                                                                                                                               No. 12-CR-56 ML

JARED LEMAY AND COREY RIDOLFI
        Defendants.

**MEMORANDUM AND ORDER**

This matter is before the Court on Corey Ridolfi's ("Ridolfi") and Jared Lemay's ("Lemay") (collectively "Defendants") joint motion to suppress physical evidence seized from an automobile. For the reasons set forth below, Defendants' motion is denied.

I. Background

The Court conducted an evidentiary hearing on Defendants' motion on March 20, 2013. At the hearing the Government presented two witnesses: Cumberland, Rhode Island Police Officers Jonathan Cook ("Cook") and David Rosa ("Rosa"). Ridolfi presented one witness, Cumberland Detective Jackie Hooper ("Hooper"). The following findings of fact are based upon the Court's evaluation of the evidence and its determination that the witnesses were all credible.

At approximately 4:17 a.m. on November 28, 2011, Cook received a dispatch advising him that a resident at 10 Birchwood Drive in Cumberland reported that an individual had rung the doorbell. The complainant saw a male, wearing dark clothing and a winter hat with ear flaps, walking away from the residence. Cook arrived on Birchwood Drive in less than a minute after he received the dispatch.

Birchwood Drive is in a thickly settled residential section of Cumberland. When Cook arrived in the area he noticed a Ford Focus ("Focus") parked on the side of the road. The Focus was parked in the area of 28 Birchwood Drive. The vehicle was parked legally; its lights were off and the engine was not running.

Upon approaching the vehicle, Cook positioned his vehicle next to the Focus, driver's side door to driver's side door. Cook observed two males in the Focus; Ridolfi in the driver's seat and Lemay in the front passenger seat. Cook noticed that both males were dressed in similar fashion: dark colored jackets, red bandannas loosely tied around their necks, and winter hats with ear flaps. Cook testified that at the time the weather was unusually mild with the temperature in the fifties.

While Cook, Ridolfi, and Lemay remained in their respective vehicles, Cook started a conversation. Cook asked Ridolfi what he was doing in the area. Ridolfi stated that he was on his way home to Green Street in Cumberland. Ridolfi explained that he was coming from North Attleboro, Massachusetts, and that he was checking his Global Positioning System ("GPS") because he was lost. At this point, Cook exited his vehicle and positioned himself outside of the driver's-side-door of the Focus. Cook noticed that Ridolfi was wearing dark colored pants and that he was beginning to sweat. Cook also questioned Lemay. Lemay explained that he had picked up Ridolfi from Ridolfi's girlfriend's house in North Attleboro and they were returning to Green Street. Cook did not believe that Ridolfi and Lemay were being truthful.

After the initial inquiry concerning what Ridolfi and Lemay were doing in the area, Cook asked Lemay and Ridolfi for their names and dates of birth. They responded and Cook conveyed the information to dispatch. Dispatch informed Cook that both Ridolfi and Lemay had

suspended drivers' licenses. Around this time, Rosa arrived on the scene and parked his vehicle behind the Focus. Cook briefed him on the situation. Rosa observed that Ridolfi was wearing a dark heavy winter jacket, a winter hat with ear flaps, and a red bandanna around his neck.

While Ridolfi and Lemay were still in the Focus, Cook and Rosa decided to separate them. Rosa had Lemay exit the Focus and proceed to the area of Rosa's vehicle. Rosa asked Lemay to place his hands on the back of his vehicle and Rosa performed a Terry pat.[1] Rosa did not discover any weapons or contraband on Lemay. After the Terry pat, Rosa placed Lemay in the back seat of Rosa's vehicle.

While Lemay was in Rosa's vehicle, Rosa asked him if he had rung the doorbell at 10 Birchwood Drive. Lemay answered Rosa that he had not. Lemay told Rosa that he had been with Ridolfi all night in North Attlelboro at Ridolfi's girlfriend's house. Lemay explained that, around 4 a.m., they decided to leave North Attleboro and go to Green Street. Lemay stated that he was not sure why they had stopped, but it may have been because they were lost. While Rosa was speaking to Lemay, Cumberland Police Officer Rex Kirkman ("Kirkman") arrived at the scene.

After questioning Lemay, Rosa left Lemay in his vehicle and returned to the Focus where Rosa briefed Cook on his discussion with Lemay. Cook was standing outside of the Focus and Ridolfi was still inside the vehicle. Rosa asked Ridolfi whether he had rung the doorbell at 10 Birchwood Drive. Ridolfi answered that he had not. Ridolfi told Rosa that he had been at his girlfriend's house in North Attleboro. Ridolfi, however, told Rosa that only he and his girlfriend were at her house. He told Rosa that he telephoned Lemay, who was in Woonsocket, Rhode

---

[1] See generally Terry v. Ohio, 392 U.S. 1 (1968).

Island, and asked Lemay to pick him up in North Attleboro. Rosa asked Ridolfi if he knew the time that he placed the telephone call to Lemay. Ridolfi then showed Rosa a time stamp of a call on his cell phone, purportedly to Lemay, at 4:08 a.m. When Rosa asked Ridolfi how Lemay could leave Woonsocket, travel to North Attleboro, and then to Birchwood Drive in a matter of approximately 10 minutes, Ridolfi could only muster a blank stare. By this time, Ridolfi appeared very nervous, he was sweating and making poor eye contact.

After this conversation, Rosa asked Ridolfi to exit the vehicle and Ridolfi did as asked. Rosa then began to perform a <u>Terry</u> pat on Ridolfi. Rosa testified that Ridolfi's jacket covered his waist area. Rosa asked Ridolfi if he had any weapons on his person. Ridolfi informed Rosa that he had a knife on his belt. Ridolfi lifted up his jacket, which concealed the knife, and Rosa retrieved the knife. The knife was in a sheath on Ridolfi's belt loop. Because the knife blade was over three inches in length, Rosa handcuffed Ridolfi and placed him under arrest for possession of the knife.[2] Around the time of the <u>Terry</u> pat of Ridolfi, Kirkman informed Cook that Ridolfi was a suspect in a burglary. After Ridolfi's arrest, Lemay was placed in Kirkman's vehicle and Ridolfi was placed in Rosa's vehicle.

While at the scene, dispatch informed Cook that Lemay's father was the registered owner of the Focus. Another police officer at the Cumberland police station attempted to contact Lemay's father. The officer, however, was unsuccessful. After Cook learned that the registered owner of the Focus could not be reached, and because Ridolfi was under arrest and Lemay had a

---

[2] R.I. Gen. Laws § 11-47-42(a)(3) prohibits a person from carrying a concealed knife having a blade in excess of three inches in length.

suspended driver's license, Cook elected to have the vehicle towed.[3]

Cook testified that, consistent with the Cumberland Police Department Impound and Tow Policy ("Impound Policy") and its Inventory Policy, he and Rosa began an inventory of the vehicle at the scene. They began with the passenger compartment. Cook and Rosa discovered a folding knife in the driver's side door panel pocket, currency (some of it foreign) on the front seat, a shotgun shell on the rear driver's side seat, and a gold colored ring, which appeared to have a diamond stone, under the rear seat.[4] Rosa also noticed a GPS device on the front seat. Rosa testified that the inside of the Focus was messy and contained many different items.

After conducting the inventory of the passenger compartment, consistent with the Inventory Policy, Cook opened the trunk of the Focus and noticed that it was full of items. Among the items in the trunk, Cook observed two marijuana pipes and a gun case. Cook, however, did not examine these items at the scene. Cook testified that, because of the volume of items in the trunk, he would have had to lay the contents of the trunk on the street if he had performed the inventory at the scene. Cook therefore decided to have the Focus towed to the Cumberland police station to continue the inventory search in the secure impound lot.

Once Cook decided to have the Focus towed to the impound lot, Ridolfi was transported to the Cumberland police station by Rosa; Lemay was given a ride to his home by Kirkman. Cook followed the Focus as it was towed to the Cumberland police station. Rosa brought the two knives, ring and shotgun shell to the police station. After Rosa returned to the police station, he completed an "evidence log sheet." The log sheet listed the items discovered in the inventory

---

[3] As noted, Ridolfi also had a suspended driver's license.

[4] The rear seat was loose so Rosa pulled the seat cushion up and discovered the ring.

search and other items seized at the scene.

After the Focus was secured in the impound lot, Cook resumed the inventory of the contents of the trunk. He first removed the gun case that he had observed at the scene. He then observed another gun case. He opened both cases and removed two shotguns, each with an obliterated serial number. Cook also removed a replica handgun from the trunk. Cook testified that, at this point, he terminated his inventory and decided to turn the matter over to the detective division. Cook assigned the guns property numbers and placed the guns in the police department's evidence room. Later that morning, Cook conferred with two detectives and briefed them on the matter.

Based on information provided to her, Detective Jackie Hooper completed an affidavit in support of an application for a search warrant for the vehicle. A Rhode Island District Court judge issued a search warrant to search the Focus.

## II. Analysis

### A. Standing

As an initial matter, the Government challenges Ridolfi's standing to argue for the suppression of the items seized from the Focus.[5] "The concept of standing under the Fourth Amendment refers to a defendant's burden of proving a legitimate expectation of privacy as a prerequisite to challenge unlawful police conduct." United States v. Gomez-Vega, 519 F. Supp. 2d 241, 255 (D.P.R. 2007); see also United States v. Romain, 393 F.3d 63, 68 (1st Cir. 2004) (the "Fourth Amendment does not protect privacy in any and all circumstances. Among other limitations, a criminal defendant who wishes to embark upon a Fourth Amendment challenge

---

[5]The Government does not challenge Lemay's standing.

must show that he has a reasonable expectation of privacy in the area searched and in relation to the items seized.") (internal quotation marks and citation omitted). "Unless and until the 'standing' threshold is crossed, the bona fides of [a] search and seizure are not put legitimately into issue." United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988).

Ridolfi argues that he has standing to challenge the search of the Focus because he was driving the vehicle and because he was in the vehicle with the son of the registered owner. In assessing a defendant's standing to contest a search, courts consider factors such as "ownership, possession, and/or control; historical use of the property searched. . . ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case." Id. at 856-57.

In United States v. Lochan, 674 F.2d 960 (1st Cir. 1982), the First Circuit held that the driver of a vehicle, who had the vehicle registration in his pocket and was traveling with the owner of the vehicle, did not have standing to contest the search of a vehicle. Id. at 965.

> The fact that [defendant] was driving, presumably with [the owner's consent], is one factor to be considered, as is the fact of the long trip, which would engender a slightly greater privacy expectation than would a short trip. Possession of the vehicle registration indicates control, but that is diluted by the owner's presence. These facts are far outweighed by several others. [Defendant] did not own the car, nor was there evidence that he has used the car on other occasions. There was no evidence as to the responsibility or control [defendant] had over the automobile other than the fact that he was driving it when stopped.

Id. In United States v. Sanchez, 943 F.2d 110 (1st Cir. 1991), the First Circuit considered whether a driver who borrowed a vehicle from a friend, whose girlfriend owned it, had standing to contest a search of the vehicle. The defendant in Sanchez argued that he had standing because

he possessed the vehicle, was its sole occupant, and was driving alone on a long trip. Id. at 113. The First Circuit held that the defendant did not have standing because he did not own the vehicle, did not have direct authority from the owner to use the vehicle, and there was no evidence that he had used the car on other occasions. Id. at 114. In addition, the defendant did not claim any interest in the items seized. Id.

Ridolfi argues that because he was driving the Focus and because he "had to have" Lemay's permission to travel in the vehicle, he had a legitimate expectation of privacy in the Focus. Ridolfi did not present any evidence that he had any authority from the owner to use the car, that he had any control or responsibility for the vehicle, or that he had a history of regular use of the vehicle. See id. The record is devoid of any "intimate relationship" with the owner of the Focus. See id. In fact, the record is silent as to whether Lemay, had permission from his father, the registered owner, to operate or use the vehicle. According to his own statements to Cook and Rosa, Ridolfi was on a short drive from a neighboring town. See Lochan, 674 F.2d at 965. Finally, Ridolfi claims no interest in any of the items seized from the Focus. See Sanchez, 943 F.2d at 114. The Court concludes that Ridolfi lacks a sufficient expectation of privacy in the car to entitle him to challenge the search.

B. The Search

Even if Ridolfi had standing to challenge the search, that challenge would prove fruitless. Both Defendants argue that the search violates the Fourth Amendment because it was tainted by Ridolfi's unlawful arrest. Defendants contend that there was no foundation for the Terry pat of Ridolfi which uncovered the knife and led to his arrest, because there was no basis to believe that Ridolfi was armed and dangerous. Defendants conclude that, because Ridolfi's arrest was

unlawful, the subsequent search of the car and seizure of the items must be excluded as fruits of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471 (1963).

A police officer may "frisk an individual if the officer has reasonable suspicion that the person is armed and dangerous. . . ." United States v. Am, 564 F.3d 25, 29 (1st Cir. 2009). Reasonable suspicion requires "more than a mere hunch but less than probable cause. . . ." Id. (internal quotation marks and citation omitted). To determine whether a frisk is justified, courts consider the totality of the circumstances. Id. The "court must evaluate [the] circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his [or her] experience and training." Id. at 30 (internal quotation marks and citation omitted); see also Estrada v. Rhode Island, 594 F.3d 56, 66 (1st Cir. 2010) (the "inquiry of whether an officer has reasonable suspicion to conduct a pat-down search requires a consideration of the totality of the circumstances to see whether the officer had a particularized, objective basis for his or her suspicion") (internal quotation marks and citation omitted). This task "demands a practical common sense approach." United States v. Soares, 521 F.3d 117, 120 (1st Cir. 2008) (internal quotation marks and citation omitted).

"Though not every Terry stop justifies a frisk, some crimes by their very nature are so suggestive of the presence and use of weapons that a frisk is always reasonable when officers have reasonable suspicion that an individual might be involved in such a crime." United States v. Barnett, 505 F.3d 637, 640 (7th Cir. 2007). The "right to frisk must be immediate and automatic if the reason for the stop is . . . an articulable suspicion of a crime of violence." Terry, 392 U.S. at 33 (Harlan, J., concurring).

If an officer possesses reasonable suspicion that the detained suspect committed a

> violent or serious crime — such as murder, robbery, rape, burglary, assault with a weapon . . . the officer by definition is dealing with an individual reasonably suspected of committing a crime that involves or is associated with carrying or using a weapon. In such cases, it logically and necessarily follows that the officer may reasonably conclude the suspect may be armed and presently dangerous.

United States v. Bullock, 510 F.3d 342, 346 (D.C. Cir. 2007) (emphasis added) (internal quotation marks and citation omitted); see also United States v. Maguire, No. 2:11-cr-149-GZS; 2012 WL 473968 (D. Me. Feb. 13, 2012 (same), affirming recommendation, 2012 WL 1119312 (D. Me. April 3, 2012); see generally United States v. Snow, 656 F.3d 498 (7th Cir. 2011) (burglary is type of crime that likely involves a weapon); United States v. Walker, 924 F.2d 1 (1st Cir. 1991) (burglars often carry weapons or other dangerous objects); United States v. Moore, 817 F.2d 1105 (4th Cir. 1987) (burglary often involves use of weapons).

Courts "routinely hold that protective frisks to ensure officer safety are permissible when an officer has reasonable suspicion that the suspect committed a crime involving or associated with carrying or using a weapon." Bullock, 510 F.3d at 347; see also In re Doe, 188 P.3d 922 (Idaho Ct. App. 2008) (noting that several jurisdictions have concluded that burglary is so suggestive of the presence and use of weapons that a frisk is always reasonable when officers have a reasonable suspicion that an individual might be involved in such a crime); see also Terry, 392 U.S. at 33 (Harlan, J., concurring) (there "is no reason why an officer, rightfully . . . confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a [weapon]").

Cumberland police received a report, at 4:17 a.m., from a resident at 10 Birchwood Drive, that an individual had rung the doorbell. The complainant saw a male, wearing dark clothing and a winter hat with ear flaps, walking away from the residence. Cook responded almost

10

immediately to the scene, a thickly settled residential area, and saw the Focus, with lights and engine off, parked in close proximity to 10 Birchwood Drive. When he arrived at the scene, Cook observed that both Defendants were wearing dark colored jackets, winter hats with ear flaps, and red bandannas loosely tied around their necks.[6] Defendants were dressed in a manner that was consistent with the complainant's description of the individual the complainant saw walking away from the residence. Thus, Defendants had a "temporal and spatial connection" to 10 Birchwood Drive. United States v. Brake, 666 F.3d 800, 805 (1st Cir. 2011). Furthermore, Defendants' manner of dress was inappropriate for the weather conditions that morning. While at the scene, police also learned that both drivers had suspended driver's licenses, raising further suspicion. After questioning, officers concluded that Defendants provided inconsistent and implausible explanations of how they came to be in the area. Moreover, Ridolfi was nervous, sweating and making poor eye contact. See generally Barnett, 505 F.3d at 640 (defendant's high degree of nervousness and indirectness contributed to officer suspicion that he was involved in robbery).

Cook and Rosa had particularized and objective reasons to believe that Ridolfi and Lemay were in the process of committing or attempting to commit burglary, a crime reasonably expected to involve a weapon. See generally Snow, 656 F.3d 498; Walker, 924 F.2d 1. Furthermore, given what Ridolfi was wearing – a heavy winter jacket – "it was not possible for [the officers] to determine just by looking at [Ridolfi] whether a weapon might be concealed by his clothing." Snow, 656 F.3d at 504. In order for an officer to lawfully frisk an individual, the

---

[6]Bandannas can be used to hide one's face. See generally State v. Stewart, 141 Wash. App. 1014, 2007 WL 3077362 (Wash. Ct. App. 2007).

11

"officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man [or woman] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." Walker, 924 F.2d at 4 (internal quotation marks and citation omitted). An "officer approaching a suspect in connection with a break-in is entitled to ensure that no weapons are hidden underneath a heavy . . . coat." United States v. Stroman, 500 F.3d 61, 64 (1st Cir. 2007).

The Court concludes that the suspected offense, together with the attendant circumstances, provided a sufficient basis for the frisk of Ridolfi. See generally State v. Scott, 405 N.W.2d 829, 832 (Iowa 1987) (internal quotation marks and citation omitted) (an "officer investigating a burglary, especially in a residential area at an early morning hour, has reasonable cause to believe a frisk is necessary for his [or her] safety since the suspect might be armed with weapons, or tools such as knives and screwdrivers which could be used as weapons. . ."). Because the frisk of Ridolfi was lawful, so too was the discovery of the knife which led to Ridolfi's arrest.

Cook testified that because the registered owner could not be reached, and because Ridolfi was under arrest and Lemay could not legally drive the vehicle, Cook elected to have the Focus towed. That decision was consistent with the Impound Policy. The Impound Policy provides that "[w]hen the operator is arrested . . . the vehicle may be turned over to a licensed capable operator at the scene with the permission of the owner/operator or the vehicle may be towed." Government's Exhibit 1 at § IV D2.

An "impoundment decision made pursuant to standardized procedures will most likely, although not necessarily always, satisfy the Fourth Amendment." United States v. Coccia, 446

12

F.3d 233, 238 (1st Cir. 2006). Reasonableness is the touchstone. Id. In this instance, the "officers' compliance with [the Impound Policy] is strong evidence that their decision was reasonable." United States v. Awer, No. CR-06-061S, 2007 WL 172258, at *5 (D.R.I. January 23, 2007). In addition, the officers' failed attempt to contact the registered owner of the vehicle, although not required by the Impound Policy, also suggests that the decision to tow the Focus was reasonable under the circumstances.

Furthermore, under these circumstances, impoundment of the Focus was also a reasonable community caretaking function. "Officers may impound a vehicle for 'community caretaking' purposes, including possession against vandalism or theft or when there is no one immediately on hand to take possession of the car, so long as the impoundment decision was reasonable under the circumstances." United States v. Martinez, 11-10195-RWZ, 2012 WL 5842601, at *3 (D. Mass. November 16, 2012) (internal quotation marks and citation omitted); see also United States v. Sanchez, 612 F.3d 1, 4 n.2 (1st Cir. 2010) (community caretaking function allows police to impound a vehicle when it is reasonable to do so, including to protect a vehicle from theft or vandalism); Coccia, 446 F.3d at 239 (the First Circuit has "frequently held that impoundments of vehicles for community caretaking purposes are consonant with the Fourth Amendment so long as the impoundment decision was reasonable under the circumstances"); United States v. Monteiro, 03-10329PBS, 2005 WL 2177113 (D. Mass. Sept. 6, 2005) (police made a reasonable decision to impound a car after the arrest of the driver where one passenger could not drive a stick shift and the other passenger had a suspended driver's license). Courts have found that police may lawfully impound a vehicle that would otherwise remain on the side of a highway, city street or in a private parking lot. United States v. Ramos-Morales, 981 F.2d

625 (1st Cir. 1992). "[T]he significant risk that an abandoned car will be stolen or damaged does not seem confined to busy streets, 'high crime' neighborhoods, or commercial parking lots." Id. at 626-27.

Police are permitted to conduct a warrantless search of a motor vehicle pursuant to a standardized inventory policy. United States v. Hawkins, 279 F.3d 83 (1st Cir. 2002). One purpose of an inventory search is to document items of value "both to protect the owner's property while in police custody, and to protect the police against future claims of misappropriation." United States v. Trullo, 790 F.2d 205, 206 (1st Cir. 1986). An inventory search must be reasonable in scope, Monteiro, 2005 WL 2177113, and not a ruse to rummage for investigatory purposes. United States v. Bartlett, 2:12-CR-28-GZS, 2012 WL 3575261 (D. Me. July 31, 2012), report and recommendation adopted, 2012 WL 3575232 (D. Me. Aug. 20, 2012). "The subjective intent of the [police] is not relevant so long as [the police] conduct a search according to a standardized inventory policy." Hawkins, 279 F.3d at 86.

Cook testified that he performed an inventory of the vehicle pursuant to the Cumberland Police Inventory Policy. The Inventory Policy provides that "any seized vehicle be inventoried and the inventory be properly recorded" on a motor vehicle inventory report form. Government Exhibit 2 § II, III B. The policy also provides that the inventory begin with the interior of the vehicle followed by an inventory of the trunk. Id. at § III B. The "inventory of personal items and valuables will extend to all storage areas . . . and will include . . . the trunk of the vehicle and any unlocked freestanding containers found therein." Id. at § III D. The policy leaves to the police officer's discretion where the vehicle will be inventoried, however, the inventory must be performed as soon as possible and in a safe area. Id. at § III C.

Defendants argue that the inventory search was not performed pursuant to the policy because officers failed to complete a motor vehicle inventory report form. Rosa testified that although he had a motor vehicle inventory report form at the scene, he did not complete it at the scene. Rosa, however, completed an evidence log sheet of the inventory when he arrived at the police station.

The fact that Rosa and Cook did not follow the inventory policy to the letter is not fatal. "We will not hold that the officer's failure, technically, to follow the inventory form procedures for valuables meant it was not an inventory search." Trullo, 790 F.2d at 206. Cook testified that although the inventory search began at the scene he halted it when he saw the quantity of items in the trunk. Rosa testified that when he returned to the station he listed the items found in the car, up until the search at the scene was discontinued, on another form. See generally United States v. Mayfield, 161 F.3d 1143, 1145 (8th Cir. 1998) (inventory search was proper where, once inventory started, place of impound changed from private lot to state patrol's district office and officer failed to complete, after starting, an inventory list at the scene but seized items were later listed on an "evidence form"). When Cook resumed the inventory search at the impound lot, he quickly terminated it when he found the guns. At that point, he turned the case over to detectives. Cook documented the guns by assigning them property numbers and placing them in the department's evidence room. The Court concludes that although the items seized as a result of the inventory were not memorialized on a motor vehicle inventory report form, under the circumstances of this case, the items seized in the inventory were sufficiently documented. "The Fourth Amendment is not offended if, considering the totality of the circumstances, the inventory search is reasonable." Id. at 1145. Based upon the totality of the circumstances, this Court finds

15

that both Rosa and Cook acted reasonably.

Defendants argue that because Cook was aware, at the scene, that Ridolfi was a suspect in a burglary, the inventory search was a subterfuge for a warrantless investigatory search. The "Supreme Court has not required an absence of expectation of finding criminal evidence as a prerequisite to a lawful inventory search." Bartlett, 2012 WL 3575261 at *13. "As long as impoundment pursuant to the community caretaking function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking motives will not invalidate the seizure." United States v. Gordon, 23 F. Supp. 2d 79, 84 (D. Me. 1998) (internal quotation marks and citation omitted). The Court finds that the evidence as whole indicates that Rosa and Cook properly conducted an inventory search after Ridolfi was placed under arrest and they unsuccessfully attempted to have the registered owner retrieve the vehicle. In particular, the attempt to contact the registered owner belies Defendants' contention that the inventory search was a pretext or subterfuge.

For these reasons, Defendants' challenge fails. The motion to suppress is denied.

SO ORDERED

/s/ Mary M. Lisi
Mary M. Lisi
Chief United States District Judge
April 17, 2013.